R. T. BENNETT ET AL., RESPONDENTS, v. JOSEPH A. GERK, DEFENDANT, WILLIAM F. NICKLIN ET AL., INTERPLEADERS, APPELLANTS.—61 S. W. (2d) 241.

St. Louis Court of Appeals. Opinion filed June 20, 1933.

*Creech & Creech* for appellant, Nichlin.

602

*O. H. Avery* and *Williams & Huston* for respondents R. T. Bennett, George McGregor and Jesse Groshong.

*F. D. Wilkins* and *Frank Howell* for appellants, R. H. Brown and E. D. Hamilton.

604

· KANE, J.—This is an action brought in the Circuit Court of Lincoln County, Missouri, to recover a reward in the sum of $2,000 for the arrest and delivery to police officers of the City of St. Louis, Missouri, of Charles Heuer and Edward Barcume, who were wanted for the kidnapping of Alexander Berg. Suit was brought by R. T. Bennett, George McGregor, Deputy Sheriffs, and Jesse Groshong, Sheriff, respectively of Lincoln County, Missouri, against Jos. A. Gerk, Chief of Police of the City of St. Louis, Missouri. After the filing of the petition, the defendant, Jos. A. Gerk, entered his appearance in Lincoln County, Missouri, and filed an answer admitting the offer of the reward and that Charles Heuer and Edward Barcume had been arrested and delivered to the police officers of the City of St. Louis, Missouri, by R. T. Bennett and George McGregor, but stating that several claims had been made on him for the reward and asked leave of court to deliver said reward of $2,000 to the Clerk of the Circuit Court of Lincoln County, Missouri, and prayed an order of the court requiring all claimants to interplead for said reward. Defendant, Jos. A. Gerk, was permitted to pay said sum into the

hands of the clerk and an order was made requiring all parties interested to file interpleas. The following parties, who are residents of Hawk Point, Lincoln County, Missouri, in addition to the plaintiffs, entered their appearance claiming said reward and filed interpleas: E. D. Hamilton, R. H. Brown, William F. Nicklin, Thomas D. Hammond, Florence Cregger and Ralph C. Cannon.

The trial judge, Honorable Edward B. Woolfolk, having disqualified himself, by consent of the parties, Honorable Judge WILLIAM C. HUGHES was called as a special trial judge in said cause.

The cause was heard by the court, who entered a decree dismissing the interpleas of Florence Cregger and Ralph Cannon, and awarding to the interpleader, T. D. Hammond, Constable, the sum of $200, to interpleader, William F. Nicklin, the sum of $200, and to joint interpleaders, R. H. Brown, cashier, and E. D. Hamilton, station agent, the sum of $200 to be divided equally between them; the balance of said reward of $2,000, after the payment of costs of suit, to be awarded to interpleader plaintiffs, R. T. Bennett, George McGregor, deputy sheriffs, and Jesse Groshong, sheriff.

After unavailing motions for a new trial, this cause is here on appeal by William F. Nicklin, interpleader, and R. H. Brown and E. D. Hamilton, joint interpleaders. It is stipulated that the appeals of interpleader William F. Nicklin, and joint interpleaders, R. H. Brown and E. D. Hamilton should be heard together.

The evidence tends to show that on the 6th day of November, 1931, Alexander Berg, residing at the Park Plaza Hotel in the City of St. Louis, was kidnapped and held prisoner, while a gang of kidnappers including Heuer and Barcume negotiated for ransom. All of the kidnappers had been arrested before November 16th except Heuer and Barcume, on which day Chief of Police Jos. A. Gerk offered a reward of $2,000, which was provided by unknown persons, the reward being as follows:

"$2,000 Reward

will be paid for the arrest and delivery to police officers of the City of St. Louis, Missouri, of Charles Heuer and Edward Barcume, wanted for kidnapping. If one is captured and delivered the reward will be $1000.

"Information relative to one or both fugitives will be thankfully received, and, if arrested, WIRE.

"Jos. A. Gerk,
Chief of Police."

Copies of this reward were mailed to all sheriffs, constables and peace officers of the State, together with pictures of Heuer and Barcume, and were also published in the St. Louis Globe-Democrat and St. Louis Post-Dispatch.

The bank at Winfield in Lincoln County, Missouri, had been robbed on November 18, 1931; this fact, together with the information that there were abroad in the land two kidnappers, who probably were the bank robbers, and for whose arrest and delivery to the police of the City of St. Louis the reward was offered, attracted the attention of these claimants (Nicklin, Hamilton and Brown), and caused them to note with particular care these strangers who appeared in and about the railroad station at Hawk Point, Missouri, on the morning of November 19, 1931.

Who earned the reward? is the question.

We shall first take up the claim of interpleaders, Brown and Hamilton, R. H. Brown, cashier of the bank at Hawk Point, and E. D. Hamilton, who at the time was station agent for the C. B. & Q. Railroad Company, join their claims and base their right to the reward on the ground that William F. Nicklin was their agent in bringing about the arrest of Heuer and Barcume.

Hamilton testified that he knew of the offer of the reward; that when he arrived at the railroad station to go to work at 7:30 A. M. on the morning of November 19, 1931, he noticed three men in the men's toilet, which was some distance from the station. Shortly thereafter one came out and went up town and came back with a tin bucket, returning to the toilet where he (Hamilton) later found them eating lunch; that his attention and suspicions were aroused by their peculiar conduct; that one of these men purchased three railroad tickets to Mexico, Missouri, and inquired the train time; that he then went to the bank and conferred with R. H. Brown, the cashier, about these strangers; that he and Brown were comparing notes and discussing the peculiar conduct of these strange men when William F. Nicklin arrived and joined in the discussion of their acts and movements.

Hamilton further testified: ''I began to think something should happen, I went up to the bank and talked to Brown about arresting them; I said I thought we should call the sheriff to arrest them; about that time Wm. Nicklin came in; I left the bank, had to go back to my duties, thought that Brown would arrange to call the sheriff. I went to the bank to talk to the cashier of the bank about the actions of these fellows and about having them arrested. I told Mr. Brown I thought they were the Winfield bank robbers and, possibly, might be the kidnappers; I told him I believed they were criminals and should be arrested, and stated to Nicklin about them buying tickets to Mexico. Brown told me he would call the sheriff and would call Winfield to get a description of the bank robbers. I left; Nicklin was still in there; I went back to the station and remained then until the officers came, preparing for the arrival of the train; when the sheriff arrived I was on the platform loading some mail.''

R. H. Brown, cashier, who joined E. D. Hamilton for his right to reward, testified that he is the cashier of the Peoples Bank at Hawk Point; that he knew a reward had been offered for the kidnappers; that he got this information through the Globe-Democrat; that on the morning of November 18, 1931, on his way to the bank he saw a strange man. He further testified ''As I was going into the bank he passed me going down the street; he held his head down and did not speak and would not look into my eye; I could observe his general appearance; at that time I did not recognize him as one of the kidnappers. Afterwards I saw him going back and he had a bucket in his hand; at that time I did not recognize him as a kidnapper; I next saw the man at the station. . . . I saw Ed. Hamilton that day; he came to the bank about nine-thirty and I said 'We have some strange people in town this morning' and he said 'Yes, he has two bundles at the station.' . . . He said that they changed their clothes in the toilet and while this conversation was going on Billy Nicklin came in and I continued to talk to Hamilton. He told me about the man that came down to buy the tickets and said his face was familiar to him. He suspicioned him being the man he had seen in the paper. I said: 'Well, I think some action should be taken.' He said he had to go back to the station and I told him I thought we should call Winfield and see about the bank robbers, get a description. I told him I would take care of the calling for him. He said 'alright, you do the calling, I will go back to the station and keep watch on the men.' Hamilton gave me a description of one of these men that bought the tickets from him; then it was that I recognized them as being the kidnappers from the description that Mr. Hamilton gave me. As soon as he left, I went to the 'phone and called the Winfield Bank and Mr. Spencer answered and I told him we had three strange men in town and thought perhaps they were the bank robbers. He said the sheriff left there a few minutes ago and said they had located them at East Alton. William Nicklin was in the bank at the time. He was there when Hamilton left. *I told Nicklin to go to T. D. Hammond and tell him to hold these people at the station. Hammond is constable of our township. He turned around and went out as though he was going there.*''

T. D. Hammond, the constable's testimony in so far as it pertains to the part that Nicklin had in causing the arrest of Heuer and Barcume, is as follows: That he was the constable of Hawk Point Township at the time in question; that he knew of the offer of reward, having seen it in the St. Louis Post-Dispatch and Globe-Democrat and he saw William F. Nicklin on the streets of Hawk Point on the morning of November 19, 1931. He further testified: ''I saw William Nicklin about twenty minutes to ten on this morning. He came along Main Street and he met me, said he wanted to talk about

some suspicious looking characters back there and he thought they should be arrested; he stated that he knew the Winfield Bank was robbed yesterday and they might be bank robbers and also kidnappers. I told him I would try to get the sheriff.''

''Q. You didn't go to arrest them yourself? A. No, I did not, a man of my age does not want to attack three bank robbers; I am 78 years of age.''

''I went to the telephone exchange and called the sheriff's office. I talk to Mr. Huckstep. I told him/ that there were some suspicious characters there and we thought might be bank robbers. He stated that the sheriff was not in the office, but his deputies were there. I told him to send the sheriff up, that they had tickets to leave on the ten o'clock train and to try to get them there by that time, if possible, and he said Bennett would try to get there. After my conversation with Mr. Huckstep I went out on the street to watch for them, to let them know where they were, so when they drove up they would not lose any time.''

On cross-examination, Hammond further testified as follows:

''Q. What time of the day was it that you first heard of three strangers being in Hawk Point? A. I knew it after Nicklin told me about it, in about ten to twenty minutes the train would be due, it must have been about twenty-five minutes after ten the train was due.

''Q. What did Nicklin say to you? A. He said there were suspicious looking characters over in town, and well dressed, and they were buying things, and getting overalls, and he said you know the bank was robbed at Winfield yesterday, and those fellows might be the bank robbers, and possibly the kidnappers, and wanted them arrested.

''This conversation took place in Hawk Point, right across from the hardware store, about fifteen or twenty steps from the corner.

''Q. He gave you some information about the parties being there? A. Give first information.''

. . . . . .

''Nicklin said there were some suspicious looking characters in town and he said the Winfield Bank was robbed yesterday and he said these might be the bank robbers and possibly the kidnappers, and that he thought they should be arrested.

''Q. And he told you that you should arrest them? A. He said he thought they ought to be arrested. I said I will go and call the sheriff and have him come and arrest them.

''Q. What did he say about the matter when you told him you would call the sheriff? A. Proper thing to do, necessary to get them arrested; he thought they were the bank robbers and might also be the kidnappers.

"Q. When you went to the depot after they were arrested, did you see Wm. Nicklin on the platform? A. Yes.

"Q. You had no information about Heuer and Barcume being in town, except the information given you by Nicklin? A. That is all.

"Q. Did anybody else say anything to you about arresting these three men except Nicklin? A. No, sir.

"Q. Did anybody else come to you and ask you to make any arrest except Nicklin? A. No, sir. They talked about it after they were arrested, but not before they were arrested, nobody said anything about it to me but Nicklin."

We have set out above the material facts testified to by interpleaders, Brown and Hamilton, on which they base their claim for the reward, contending that Nicklin was their agent in directing Hammond, the constable, to telephone the sheriff's office and on which the deputy sheriffs acted in arresting Heuer and Barcume. Nicklin denies this.

We cannot agree with their contention. The record does not sustain their claim. The facts and circumstances surrounding the conduct of Brown and Hamilton does not indicate that Nicklin was acting for them as their agent. Nothing appears from the record that would have prevented either one of these interpleaders from getting the information to Hammond, the constable, that they requested Nicklin to give. There was evidence to the fact that when Hamilton was requested to telephone for the sheriff that he made the statement "Not me." Certainly the relation of principal and agent could not be established in this case by the mere statement or direction of Brown to Nicklin "to go to Hammond and have them hold these people at the station."

The burden of proving that William F. Nicklin was their agent in causing the arrest and delivery to the police of the City of St. Louis was undoubtedly on interpleaders, Brown and Hamilton. They failed to meet this burden. [See Johannes v. Union Fuel Co. (Mo. App.), 199 S. W. 1032; Meux v. Haller, 179 Mo. App. 466, 162 S. W. 68.]

On the record, we must hold that there is insufficient evidence to establish that William F. Nicklin was the agent and acting for interpleaders, Brown and Hamilton, in causing the arrest and delivery of Heuer and Barcume to the police of the City of St. Louis.

It follows that their claim (Brown and Hamilton) must be denied.

Referring now to interpleader William F. Nicklin's right to this reward, he testified: That he was a life long resident of Lincoln county and had resided in the town of Hawk Point since 1918, Hawk Point being on the C. B. & Q. Railroad, some distance from the station. That on the morning of the 19th of November, 1931, he (Nicklin) was at his scales near the station on the railroad tracks and observed "these fellows" about 200 yards away near an old oil station on the right of way of the railroad; that when he first saw them he was not

sure that two of them were Heuer and Barcume; that he went down Main Street and saw Heuer go into the Enterprise Store; that he (Heuer) did not stay long, but went back to the depot; that Barcume came up and went into the Enterprise Store; that he (Nicklin) followed him in there; that Barcume bought some goods which he packed in a suit case he had purchased at the same time; that he (Nicklin) told Eversmeyer, the proprietor, that the bank of Winfield had been held up the day before and that he "bet $1 that he was one of the robbers." That when Barcume left the store, he (Nicklin) went to his home, got a newspaper and looked at the offer of the award and the pictures of the men wanted; that he (Nicklin) then went to Quinn, the justice of the peace; that while he was standing in the door, Scanlon, one of the three men, came up and walked across to the hardware store; that he (Nicklin) followed him half way across the street; that Scanlon bought a quart bucket; that he then went to the barbershop and then back to the railroad station. That he (Nicklin) then went in and talked to Quinn about the three suspicious looking characters and that he thought they were the bank robbers and kidnappers; that he then went to the bank and Hamilton and Brown were there; that he joined in the conversation; that they were talking about "these fellows," about them eating their lunch in the water closet and that he (Nicklin) asked Hamilton why he didn't have them arrested; that Hamilton responded "Not me." That he asked Brown why he did not have them arrested, but that he was not certain as to this statement, that Brown responded that he called the Winfield Bank to get a description of the Winfield robbers. That he had talked to a Mr. Spencer there; that someone for the Winfield Bank called back advising Brown that they thought they already had the robbers arrested and if not "they was on a hot track and was liable to arrest them at any time." That he (Nicklin) went back to Quinn, justice of the peace; that he told Quinn he thought these men were kidnappers and might also be the bank robbers and asked him to have them arrested. He further testified Quinn responded "I do not want to have anything to do with it." That he then went to Hammond, the constable, who was on the porch of the hardware stores; that he called across the street to him; that he told him what he knew about "these fellows"—"that they was bank robbers and I know pretty certain two of them are the kidnappers." That Hammond (constable) stated he didn't feel like he was capable of handling these fellows; that he had better get help, to help him arrest them. That he (Nicklin) agreed that this was a good idea; that he told Hammond he would have to hurry if he got them arrested before the "train came in." That Hammond went to the telephone exchange and called the sheriff; that he (Nicklin) was in front of the Enterprise store when deputy sheriffs Bennett and McGregor arrived; that

he told the deputy sheriffs that the men they came after were at the depot; that they had changed their clothes and put on overalls; that Bennett "reached in his pocket and took a gun out of his coat and done something about it and put it in his pocket." That Bennett started to walk to the depot; that "somebody" told him he better get in the car, that the train was "likely to come there before he could get down there walking."

These are the material facts as testified to by Nicklin upon which he bases his claim that he was the moving cause of the apprehension, arrest and delivery of Heuer and Barcume to the police of the City of St. Louis, and therefore, insists he is entitled to said reward.

Jesse Groshong, R. T. Bennett and George McGregor were the duly elected and qualified sheriff and deputy sheriffs respectively of Lincoln County, Missouri. R. T. Bennett in addition was constable of Bedford Township in Lincoln County, Missouri.

Bennett testified: That acting on information received by 'phone from Hammond (constable), he and McGregor proceeded to Hawk Point and made the arrest of Heuer and Barcume and also a man by the name of Scanlon, all wanted for the robbery of the bank at Winfield in Lincoln County, Missouri, returned them to Troy, the county seat of Lincoln county and placed them in jail. That the Prosecuting Attorney of Lincoln county lodged a complaint before Harry L. Welsh, a justice of the peace of Lincoln County, Missouri, charging Edward Barcume, Charles Heuer and Jack Scanlon with the offense of bank robbery (first degree robbery) by means of a dangerous and deadly weapon.

McGregor, one of the deputy sheriffs, testified: That upon arrival at Troy with the prisoners, Heuer, Barcume and Scanlon, that sheriff Groshong arrived shortly thereafter, accompanied by a Mr. Walsh a Burns detective; that Walsh identified Heuer and Barcume as the kidnappers and 'phoned to the Chief of Police of St. Louis that Heuer and Barcume had been arrested; that it was decided to turn the prisoners over to them. He further testified: "They said 'We have a charge down there that we will hang them on. Your jail is not sufficient or a safe place to keep men of that kind. It is not safe to try to hold them here.' After that Bennett, police officer Wren and myself went after the car the prisoners had abandoned. . . . We towed it to Troy and upon our arrival found that the prisoners had been taken to St. Louis."

Jesse Groshong, the sheriff, testified: That the bank of Winfield, Missouri, had been robbed on the 18th day of November, 1931; that Mr. Walsh of the Burns Detective Agency came to Troy and conferred with him concerning the robbery; that they obtained a description of the robbers from a man by the name of Morris who had been arrested and was in jail at Troy, Missouri, as one of the robbers of

the bank; that Mr. Walsh stated that from the description, the other two parties were Barcume and Heuer, the men who were being sought for kidnapping Berg; that Walsh had with him at that time cards containing the offer of the reward, fingerprints and pictures of Barcume and Heuer. . . . That they met Bennett, the deputy sheriff, on the street and told him of the information they had obtained; that from the description . . . they were certain that two of the Winfield bank robbers were the Berg kidnappers; that they went to Alton, Illinois, searching for the bank robbers; that while on the way back they stopped at Winfield and were informed that some men had been arrested at Hawk Point; that they returned to Troy and Walsh identified Barcume and Heuer; that the police officers of St. Louis were notified. . . . He further testified: "We decided to turn the prisoners over to the police officers of St. Louis, so we took them to St. Louis and turned them over to the authorities there."

It is admitted by learned counsel for Groshong, Bennett and McGregor, that they are excluded from receiving the reward on the grounds of *public policy* unless they come within the exceptions to the rule, the rule being that officers may not receive a reward for services required of them as a part of their official duty. Learned counsel earnestly insist that these officers come within the exceptions to the above rule and that therefore, they are entitled to the reward on the ground that there could have been no official duty resting upon them *to deliver* the prisoners to the police officers of the City of St. Louis, when there was a criminal charge pending against them in Lincoln county; that the delivery under such circumstances rendered a service outside of their official duties, for which they were entitled to claim and receive the reward in this case. With this proposition we cannot agree. Their unquestioned official duty was to arrest these men. They later voluntarily released the prisoners and delivered them to the police officers of St. Louis on the statement of said officers that "We have a charge down there that we will hang them on. Your jail is not sufficient or a safe place to keep men of that kind. It is not safe to try to hold them here." Being anxious to see that they were dealt with in accordance with the enormity of their crime, and being impressed with the statement that the jail in Troy was not a safe place to keep them, they released and delivered Heuer and Barcume to the police officers of the City of St. Louis.

We are not impressed with the fact that this was any extra-ordinary service or service above and beyond their sworn official duties which would entitle them to this reward; that they were courageous and efficient officers is not questioned. The sheriff was in pursuit of the bank robbers at the time he received information that these men had been arrested at Hawk Point by his deputies. His deputies acted

promptly and efficiently on information that suspicious characters were at Hawk Point. They made the arrest and recovered a sum of money in excess of $1,000, which had been taken from the bank at Winfield, Missouri.

However, these claimants (Groshong, sheriff, Bennett and McGregor, deputy sheriffs), being public officials, it is against public policy to allow them to receive a reward for the performance of their sworn official duty and for which they received fixed fees and salaries, and we must rule that the *delivery* to the police officers of the City of St. Louis was not such an act or extraordinary service alike beyond and outside the limits of their official duty which would entitle them to claim the reward.

Kick v. Merry, 23 Mo. 1. c. 76:

"The case falls within the mischief of the rule of the common law, which prohibits an officer from taking a reward as an inducement to do his duty. He received a stated salary for his services. The services rendered were within the duties of his office. All his energies had been devoted to the service of the city. Under such circumstances, to permit an officer to stipulate for extra compensation for services to which the public was entitled, would lead to great corruption and oppression in office. It would follow that whenever a crime was committed, instead of speedy efforts for the arrest of the offender, there would be a holding back, in the hope that there would be a reward given for his apprehension. If once a habit of taking a reward is introduced, nothing will be done unless the service is previously purchased by extra pay."

In Lees v. Colgan, 40 L. R. A., 1. c. 355, the California Supreme Court in a well considered opinion in which they quote with approval Kick v. Merry, 23 Mo. 72, said:

"The last legal proposition stated must be declared in the affirmative. The courts, both in this country and England, are practically unanimous in declaring that a public officer working for a fixed compensation, or whose fees are prescribed by law, cannot demand or contract for a reward for services rendered in the line or scope of his official duty. In the well considered case Re Russell, 51 Conn. 577, 50 Am. Rep. 55, it is said 'And no case can be found—at least, I have not been able to find any—in which the claim of a public officer to recover a reward for services rendered in the performance of his official duties has received the sanction of a court of last resort, in this country or in England.' A deputy sheriff making an arrest in the line of his duty is not entitled to a reward offered for such arrest. [Stamper v. Temple, 6 Humph., 113, 44 Am. Dec. 296.] In Morrell v. Quaries, it was held that a police officer making an arrest in the line of his duty was not entitled to a reward. [35 Ala. 548.] In Ex parte Gore, 57 Minn. 251, it is declared that a constable is not entitled to a

reward for making an arrest in the line of duty and that in that case it was further decided: 'The reward offered by section 2786 of the Code was designed to induce the arrest of fleeing homicides by persons not under an official obligation to do it.' A police officer in the performance of his duty is not entitled to a reward for the apprehension of a criminal. [Day v. Putnam Ins. Co., 16 Minn. 408 (Gil. 365).] A police officer cannot take a reward for services rendered within the duties of his office, or for which he receives a fixed salary. [Kick v. Merry, 23 Mo. 72, 66 Am. Dec. 658.] The same principle is again declared in Thornton v. Mo. P. R. R. Co., 42 Mo. App. 58; See also Smith v. Whildin, 10 Pa. 39, 49 Am. Dec. 572; Warner v. Grace, 14 Minn. 487 (Gil. 364). Counsel for petitioner to some extent concedes the soundness of the doctrine laid down in the foregoing cases as to rewards offered by private parties, but claims the doctrine is not to be applied to governmental or state rewards. We fail to see any substantial difference in principle as to rewards offered by private parties and rewards offered by the State. They stand upon common ground. The basis of the sound public policy supporting the text of the many cases cited is thus declared in Kick v. Merry, 23 Mo. 72, 66 Am. Dec. 658: 'The services rendered were within the duties of his office. All his energies had been devoted to the service of the city. Under such circumstances, to permit an officer to stipulate for extra compensation for services to which the public was entitled would lead to great corruption and oppression in office. It would follow that whenever a crime was committed, instead of speedy efforts for the arrest of the offender, there would be a holding back, in the hope that there would be a reward given for his apprehension. If once a habit of taking a reward is introduced, nothing will be done unless the service is previously purchased by extra pay.' This reasoning undoubtedly applies to rewards offered by the State as fully as to rewards offered by private parties. No case has been cited, and we know of none, where an appellate court has declared the existence in principle of any well-defined distinction as to public officers, in cases where rewards have been offered by the State or municipality, and where rewards have been offered by private parties. No case has been cited where a reward offered by the State or municipality has been recovered by a public officer who simply did some act or acts in the performance of his official duty as the basis of his claim." [See also Railway Co. v. Grafton, 51 Ark. 1. c. 508.]

The principle, that at common law it was against public policy for a public officer to take any additional sum in the way of a reward for extra services, has been dealt with in strong language by our courts. [Hatch v. Mann, 15 N. Y. (Wendell's Rep.), 49-50.]

"That a public officer, whose fees are prescribed by law, may maintain an action to recover an additional sum promised him by a party

for doing his official duty, is a monstrous proposition, fraught with every kind of mischief. The pretence that it is for extra services would cover any conceivable corruption or extortion. What are extra services in the performance of a defined official duty? The Supreme Court seem to define them as being 'extraordinary efforts, beyond what an officer is strictly bound to make.' But, *'Nil agit exemplum, litem quod lite resolvit.'*—What are the 'extraordinary efforts' which an officer can make to discharge his official duty, which he is not strictly bound to make? When he takes upon himself the office, he solemnly swears to discharge the duties of it 'according to the best of his ability.' Has he then an extraordinary ability beyond his best ability, for the exertion of which he may legally demand extra pay? If it be so in regard to a constable, it is equally so in regard to every other officer, judicial or ministerial. They all take the same oath, and all are embraced together in the same prohibition. The language of the 2 Revised Statutes 650, section 5 is: 'No judge, justice, sheriff, or other officer whatsoever, or other person to whom any fees or compensation shall be allowed by law for any service, shall take or receive any other or greater fee, or reward for such service, but such as is or shall be allowed by the laws of this State.'

"If a constable, for making 'extraordinary efforts' to perform an ordinary official act, may not only receive but may also collect by law a compensation beyond what the statute allows for the act, any other officer may do the same; and sheriffs, legislators and judges might and soon would put their 'extraordinary efforts' in the market, to be had by the highest bidder. This is a sickening and revolting view of the subject, I admit, but it is one forced on my mind by the case. It carried back my thoughts to scenes which I trust are never to be witnessed in this country, when chancellors and judges made a business transaction of receiving gratuities from parties for expediting, i. e. making 'extraordinary efforts' to dispose of their suits. These gratuities were not deemed bribes for perverting justice, but merely compensation for 'extraordinary efforts' to administer it 'beyond what an officer was strictly bound to make.' The great Lord Bacon, by the workings of whose mighty mind 'Darkness fled, Light shone, and order from disorder sprung' secured his eternal epitaph, of 'wisest, brightest, meanest of mankind;' not by contaminating his fingers with bribes to do injustice, for it is recorded of his judicial decisions that never one of them was reversed or even the fairness of it questioned—but by receiving gratuities for making 'extraordinary efforts' to discharge his official duty. It was because he had an itching palm and sold his offices for gold, that he was impeached, fined, imprisoned, degraded and disgraced, and that genius which like a meridian sun should have illumined a world, for this reasonable practice of taking extra pay for 'extraordinary efforts,' was shorn of its beams, and will forever 'in dim eclipse, disastrous twilight shed.'

"I have scarcely patience to look for authorities to support a principle which of itself is paramount to all authority." [See also Thornton v. Mo. Pac., 42 Mo. App. 58; Bushmeier et al. v. Special Protective Rewards Committee of the Arkansas Bankers Ass'n, 47 S. W. 1080; Cornwell v. St. Louis Transit Co., 106 Mo. App. 1. c. 139; Sumerset Bank v. Edmond, 76 Ohio St. 396, 11 L. R. A. (N. S.) 1170; Ralls Co. v. Stephens, 104 Mo. App. 1. c. 121; Woods Law of Masters & Servants, p. 334, sec. 170; 54 C. J., p. 786, sec. 30.]

On the record in this case we must rule that claimants, Sheriff Groshong and Deputy Sheriffs, Bennett and McGregor, being public officials, were acting within the scope and line of their sworn official duties when they arrested and delivered Heuer and Barcume to the police officers of the City of St. Louis, as provided by sections 3492, 3494, 3948 and 11518, Revised Statutes of Missouri, 1929. Therefore, their claim to the reward must be denied.

T. D. Hammond, at the time in question, was constable of Hawk Point Township in Lincoln County, Missouri. Therefore, his claim is denied on the same principle that we have enunciated in disposing of the claims of Groshong, Bennett and McGregor. [See section 11756, Revised Statutes of Missouri, 1929; Huhn v. Lang, 122 Mo. 600.]

We hold, on this record, that William F. Nicklin gave the first effective information which led to the arrest and delivery of Heuer and Barcume to the police officers of the City of St. Louis, and therefore, is entitled to the reward.

It follows that the judgment rendered herein is reversed and the cause remanded with directions to enter a judgment in favor of William F. Nicklin for the full amount. It is so ordered.

*Becker, P. J.*, and *McCullen, J.*, concur.